UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

GENELL ROBERTS, SANDRA DALE,       )
and WILLIAM LESLIE,                )
                                   )       Civil Action No. 6: 04-262-DCR
          Plaintiffs,              )
                                   )
V.                                 )
                                   )
COMMONWEALTH OF KENTUCKY           )
and OTHER UNKNOWN OFFICIALS OF     )       **MEMORANDUM OPINION**
KENTUCKY,                          )              **AND ORDER**
                                   )
          Defendants.              )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the Defendants' motion for summary judgment. [Record No. 8] The Plaintiffs' suit stems from their dismissal from employment at the General Burnside State Park in Pulaski County, Kentucky on May 19, 2004. The Plaintiffs claim that their dismissal violated various state and federal laws. For the reasons stated below, the Court will grant the Defendants' motion. With the entry of this Memorandum Opinion and Order, all issues raised in this proceeding have been resolved. Accordingly, Judgment will be entered this date in the Defendants' favor.

## I.    BACKGROUND

The Plaintiffs were seasonal workers employed to perform maintenance services at the General Burnside State Park during the summer months. Sandra Dale, a six-summer veteran of the park, as well as William Leslie and Genell Roberts, both four-summer veterans, maintained

"spotless work records." (Amended Compl. at ¶¶ 3-4.) Dale, in particular, "received several positive commendations" for her work.

On May 18, 2004, Director of Parks George Ward sent an e-mail to all managers of Kentucky state parks which set into motion the events giving rise to this action. The e-mail provided, in relevant part, that

> we are working hard to eliminate the deficit associated with operating the State Parks. . . . [I]t is may [sic] small details that we must pay attention to in order to attract tourists to our Parks and provide them outstanding experience that will make them want to come back and visit with us.
>
> To this end, providing outstanding customer service in a professional atmosphere creates a very positive first impression of us to the customer. Therefore, we have implemented a new professional appearance policy that ALL employees must adhere to at each Park location. Items addressed in the policy include hair length for men above the collar, no visible body piercings with exception of in the ear lobes for women only, no visible tattoos (long sleeves, pants, bandages, or wrist bands are approved ways to cover), and the proper wearing of the prescribed uniform in each department, which in most cases includes tucking in shirts and blouses. Please be advised that there are no exceptions to this policy. . . . Failure to comply with the new policy is clearly insubordination.
>
> It is your role as park managers to ensure that ALL employees comply with Park policies. Any regular merit employee that fails to comply with the new policy should be issued a written warning for insubordination. If they continue to fail to comply they should be placed on suspension. Of course, the final step, should they continue to not comply would be termination. Any interim employee that fails to comply should be given the choice to comply or be sent home. After the initial warning, any interim employee that is observed to be not complying is to be terminated.

(Pls.' Resp., Ex. B.) In a followup e-mail, Ward reiterated that "if interim workers refuse to tuck in their shirts, you may not allow them to work. Give them the choice to tuck in their shirt or go home." (Compl., Ex. B.)

These e-mails were Ward's interpretation and implementation of the Department of Parks ("Parks") Policy 01-03 (promulgated in 2002, prior to Ward's appointment), which provides that "[s]ince employees are in daily contact with guests, vendors, and the general public, all employees are expected to exhibit appropriate conduct and maintain a professional, business-like appearance." *Id.*, Ex. A. Further, "[s]upervisors and managers are expected to communicate and monitor standards of employee conduct and appearance that will provide a professional, positive, and safe environment for employees, guests, and vendors. . . . Due to business needs, many employees may be required to wear furnished uniforms or conform to appropriate levels of dress, grooming, and hygiene standards for their work situation." *Id.* Finally, "[v]isible tattoos and body piercings that are offensive or not consistent with the mission of the Department of Parks shall be deemed to be violations of sections A and B above." *Id.*

Another policy adopted at the same time as the "shirt tucking" policy prohibited Park employees from swimming in the pool or staying as overnight guests at the park at which they worked. (Compl., Ex. C.) The stated reason for the policy was to ensure "separation between employees and overnight guests" and to avoid claims of sexual harassment by Park employees. *Id.*

On May 19, 2004, the Plaintiffs were discharged for failing to tuck in their shirts. (Pls.' Resp. at 4.) Leslie also claims he was discharged because he has a "USN" tattoo on his arm, which commemorates his service in the United States Navy. *Id.* Several days after their termination, the Plaintiffs' supervisor, John Troxell, resigned in protest. The Plaintiffs brought suit, challenging the appearance policy and the "overnight stay" policy.

-3-

On September 22, 2004, the Court granted the Defendants' motion for partial dismissal [Record No. 22], dismissing all monetary claims against the Defendants and dismissing Ward as a Defendant in this case.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415 (6th Cir. 2002). Once the movant has satisfied this burden, the non-moving party cannot rely upon the assertions in its pleadings; rather, that party must come forward with probative evidence, such as sworn affidavits, to demonstrate that there is a genuine issue of material fact. *Id*.; *Celotex*, 477 U.S. at 324. However, the trial court does not have a duty to search the entire record to establish that it is bereft of any genuine issue of material fact. *In re Morris*, 260 F.3d 654 (6th Cir. 2002). The

nonmoving party has an affirmative obligation to direct the court's attention to those specific portions of the record upon which it seeks to rely to create genuine issues of material fact. *Id.* In determining whether there are any genuine issues of material fact, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

### III.   ANALYSIS

At this time, the only remaining claim is for reinstatement under the First Amendment, the Equal Protection Clause, the Due Process Clause, 42 U.S.C. § 1983, and Section Two of the Kentucky Constitution. These claims were dismissed by the Court, as they related to monetary damages, in its qualified immunity analysis in the September 22nd Memorandum Opinion and Order.

#### A.   First Amendment

Plaintiffs claim that the revised appearance policy violates the First Amendment. They claim that "[a] person's choice of how to wear their clothing is a constitutionally protected form of speech and expression . . . ." [Rec. No. 16, p. 8] They note, for instance, that the Supreme Court struck down a ban by a school district on arm bands worn to protest "hostilities" in Vietnam in 1965. *Tinker v. Des Moines School Dist.*, 393 U.S. 503 (1969). Plaintiffs citation to *Tinker*, as well as their First Amendment argument in general, ignores the crucial distinction between the government's regulation of speech by private individuals and the government's regulation of speech by its employees made in the course of their employment. Indeed, the

Supreme Court "has always assumed . . . that the government as employer . . . has far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671 (1994).

> Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. . . .
>
> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Id*. at 674-75. Recently, the Supreme Court reaffirmed that "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *City of San Diego v. Roe*, 125 S. Ct. 521, 523 (2004).

In *Connick v. Myers*, 461 U.S. 138, 146-47 (1983), the Supreme Court held that speech by a government employee that does not pertain to a matter of public concern is not protected by the First Amendment. As the *Connick* Court noted, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment" because "government offices could not function if every employment decision became a constitutional matter." *Id*. at 143, 146.

Whether the speech at issue involves a matter of public concern is typically a question of law for the court to decide. *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004). In *Farhat* the Sixth Circuit set forth four principles for analyzing whether speech is a matter of public concern:

> 1. Speech is of "public concern" if it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.

> 2. The fact that the employee engages in the speech while in the course of his or her employment does not preclude a finding that the speech touches upon a matter of public concern.

> 3. The employee's motive for engaging in the speech in question is a relevant, but not dispositive, factor when considering whether an employee's expression is of public concern.

> 4. Although First Amendment protection might not be available if the employer can show that the public employee knowingly or recklessly made false statements, a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment.

*Id*. at 590-91. In this case, the Plaintiffs' First Amendment claims fail because there is no question that their alleged "speech", *i.e.*, refusing to tuck in their shirts and displaying a "USN" tattoo, is not a "matter of public concern." This speech clearly does not involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." The Plaintiffs' speech "did nothing to inform the public about any aspect of the [Parks'] functioning or operation. Nor were [Plaintiffs'] activities anything like the private remarks at issue in *Rankin v. McPherson*, 438 U.S. 378 (1987), where one co-worker commented to another co-worker on an item of political news." *Roe*, 125 S. Ct. at 526. Thus, the Plaintiffs' alleged "speech" is not entitled to First

Amendment protection.  Simply put, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to [the government] employee's behavior."  *Connick*, 461 U.S. at 147.

### B.    Due Process

The Plaintiffs also complain about the manner in which the appearance policy was changed, asserting that it was a unilateral change that altered the long-standing interpretation that the Plaintiffs had previously relied upon.  Specifically, they complain that Ward's application of the appearance policy was actually the promulgation of an entirely new policy.  They contend that this new policy was not implemented in accordance with Chapter 13A of the Kentucky Revised Statutes because its passage was not accompanied by public notice and hearings.

The Due Process Clause of the Fourteenth Amendment prohibits the States from depriving any person of property without "due process of law."  Thus, "individuals whose property interests are at stake are entitled to 'notice and an opportunity to be heard.'"  *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (quoting *United States v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993)).  Central to a due process claim, therefore, is that a plaintiff have a property interest.  "Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quotation omitted).  Unless an employee has a legitimate expectation of continued employment from a state tenure law, or from the terms contained in the employee's employment agreement, the employee merely has an abstract concern in his continued employment, as

-8-

opposed to a property interest in it. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 578 (1972).

In this case, Kentucky has a "merit system" for state employees which can provide them with tenure. K.R.S. §§ 18A.005-18A.200. And while the parties agree that the Plaintiffs did not qualify for tenure under this merit system, the Plaintiffs claim that they were entitled to *de facto* tenure because they were each rehired between three and five times for summer employment. They argue that such status would give them a property interest in continued employment, citing *Perry v. Sinderman*, 208 U.S. 593 (1972).

In *Perry*, the Supreme Court noted that, notwithstanding the Plaintiff's lack of tenure status,

> a teacher . . . who has held his position for a number of years, might be able to show from the circumstances of this service –  and from other relevant facts – that he has a legitimate claim of entitlement to job tenure. . . . [T]here may be an unwritten "common law" in a particular university that certain employees shall have the equivalent of tenure. This is particularly likely in a college or university . . . that has no explicit tenure system even for senior members of its faculty, but that nonetheless may have created such a system in practice.

*Id*. at 602. In *Edinger v. Bd. of Regents of Morehead State Univ.*, 906 F.2d 1136, 1140 (6th Cir. 1990), the Sixth Circuit pointed out that in *Perry*,

> no formal tenure policy or system existed at the institution at which the plaintiff-teacher claimed to have obtained *de facto* tenure. This is a critical distinction between *Perry* and the case at bar because "the existence of a formal code governing the granting of tenure precludes a reasonable expectation of continued employment absent extraordinary circumstances."

*Id*. (quoting *Haimowitz v. Univ. of Nevada*, 579 F.2d 526, 528 (9th Cir. 1978)).  Likewise, the Plaintiffs in this case were subject to a formal code governing the granting of tenure.  K.R.S. §§ 18A.005-18A.200.  Thus, the Plaintiffs cannot claim *de facto* tenure status.

In essentially dismissing claims of *de facto* tenure when a tenure policy is in place, the Sixth Circuit noted that

> if repeated renewals of a non-tenure contract were sufficient to create protected property interests, virtually any public employee whose non-tenure contract has been renewed successively could claim an entitlement to continued employment. We seriously doubt that the Supreme Court intended this result by its holdings in [*Roth*] and [*Perry*].

*Id*. at 1141.  Because the Plaintiffs did not have a property interest in their employment, they have not stated a valid due process claim.

### C.    Equal Protection

The Plaintiffs claim that the revised appearance policy also violated the Equal Protection Clause of the Fourteenth Amendment because it has "glaringly unequal impact, depending on whether it is applied to employees who work in an indoor, air-conditioned environment . . . or employees who work outdoors in [high] heat at hard manual labor."  [Rec. No. 16, p. 15]  "The Equal Protection Clause protects against arbitrary classifications, and requires that similarly situated persons be treated equally."  *Richland Bookmart Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002) (citations omitted).  The Park policy, however, applies equally to all Park employees. Further, it does not engage in any suspect classifications.  The Equal Protection Clause, therefore, is not implicated by this policy.

To the extent that the Plaintiffs attempt to allege that the policy has an "unequal impact," it should be noted that the Equal Protection Clause shields only against purposeful discrimination: a disparate *impact*, even upon members of a racial minority (the most suspect classification), does not, *ipso facto*, violate equal protection. *Washington v. Davis*, 426 U.S. 229, 242, 248 (1976).  Indeed, the Plaintiffs cannot establish a prima facie disparate impact claim because they cannot satisfy the first step in making such a claim, *i.e.*, that they are a part of a class protected under Title VII.  *Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003). Therefore, the Plaintiffs cannot construct an equal protection claim on an allegation of disparate impact simply because the Parks regulations may burden people who work outside more than those who work indoors.

### D.    State Law Wrongful Discharge

Plaintiffs' Complaint states that the Defendants' actions violated their right to be free from arbitrary and wrongful discharge, pursuant to Section Two of the Kentucky Constitution. (Amended Compl. ¶ 15).  Although the Plaintiffs do not identify the basis for this claim, presumably it is based on the common law right to sue for wrongful discharge when it violates public policy, as established in *Pari-Mutuel Clerks' Union v. Ky. Jockey Club*, 551 S.W.2d 801, 803 (Ky. 1977).

The Defendants point out that "where a wrongful discharge claim is based on policy which is established by statute, and that statute provides a basis for addressing alleged violations, a wrongful discharge claim does not exist," citing *Grybz v. Evans*, 700 S.W.2d 399 (Ky. 1985). [Record No. 28, p. 9]  In their response, the Plaintiffs simply note that they "have argued that

-11-

the policy under which they were discharged is arbitrary action, and violates Section 2 of the Kentucky Constitution. . . . Plaintiffs are entitled to a trial on the merits of [this] claim." [Record No. 31, p. 8] This brief, unsupported statement is insufficient to defeat the Defendants' argument that they are entitled to summary judgment on this issue.[1]

## IV. CONCLUSION

For the reasons discussed herein, it is hereby **ORDERED** that the Defendants' motion for summary judgment [Record No. 28] is **GRANTED**. A separate judgment will be entered this date.

This 3rd day of August, 2005.



Signed By:

*Danny C. Reeves* DCR

**United States District Judge**

---

[1]     The Plaintiffs also note that they "have further challenged the promulgation of the policy that prohibited them, as Parks Department employees, from using public facilities, in violation of KRS 344.120" and argue that they are entitled to a trial on the merits for this issue. [Record No. 31, p. 8] This Court, however, has previously addressed and dismissed this claim, noting that the Plaintiffs do not have standing to challenge the "overnight stay rule." [See Record No. 22, pp. 18-19] Further, claims based upon K.R.S. § 344.120 were dismissed because "the Plaintiffs' Amended Complaint does not allege any discrimination based on disability, race, color, religion, or national origin, as required by the Kentucky Civil Rights Act." [*See* Record No. 22, pp. 17-18.]